**J.T. EATON & COMPANY, INC.,**
**Plaintiff–Appellee,**

v.

**ATLANTIC PASTE & GLUE COMPANY,**
**Defendant–Appellant.**

No. 95–1380.

United States Court of Appeals,
Federal Circuit.

Feb. 11, 1997.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
April 7, 1997.

---

D. Peter Hochberg, D. Peter Hochberg Co., L.P.A., Cleveland, OH, argued, for plaintiff-appellee.

Bernard Malina, Malina & Wolson, New York City, John M. Calimafde and Marvin N. Gordon, Hopgood, Calimafde, Kalil & Judlowe, New York City, for defendant-appellant.

Before RICH, CLEVENGER, and RADER, Circuit Judges.

CLEVENGER, Circuit Judge.

Atlantic Paste & Glue Company, Inc. (Atlantic) appeals the judgment of the United States District Court for the Eastern District of New York holding that J.T. Eaton & Company, Inc.'s (Eaton) patent for a mousetrap is not invalid and is infringed by Atlantic's accused mousetraps.

For the reasons set forth below, we conclude that the district court misinterpreted claim 1 of Eaton's patent. Consequently, we reverse the judgment that the patent is infringed, and we vacate the judgment that the patent is not invalid under 35 U.S.C. § 103 (1994). The case is remanded to the district court for further proceedings with regard to the validity issue.

## I

This suit involves United States Patent No. 4,438,584 (the '584 patent), issued on March 27, 1984, to Stanley Z. Baker and Benjamin H. Baker. The patent, assigned to Eaton, discloses a "Trap for Rats, Mice, and Other Vermin." Claim 1, the patent's only independent claim, reads, with emphasis added:

A commercial trap product for catching mice or rats comprised of a generally flat support formed of a non-porous, thin sheet material, said support having at least one positioning surface, at least one indented portion having a given depth below said positioning surface, and a relatively thick layer of pressure sensitive adhesive material contained within said indented portion having a thickness of at least 1/16 inch, *a plastic flow temperature above 120°F.* and an upper surface; said indented portion having a greater depth than the thickness of said layer of adhesive and said positioning surface being spaced above said adhesive layer upper surface.

Claim 1 thus recites a dishlike container holding a pressure sensitive adhesive material in which vermin become stuck, and thereby trapped. The commercial embodiments of the invention feature two plastic containers or traps, typically packaged together, one

on top of the other, face-to-face, capable of being hung in a vertical position at the point of sale.

After a bench trial, the district court issued findings of fact and conclusions of law in which it interpreted the limitation, "a plastic flow temperature above 120°F." Based on its interpretation, Atlantic's accused product was found to infringe claim 1. Additionally, the district court held claim 1 not invalid under § 103 for obviousness, or under 35 U.S.C. § 102(b) (1994) for having been on sale for more than one year before the filing date of the '584 patent. For the reasons set forth in the opinion of the district court, we hold that, on the facts presented in this case, claim 1 is not invalid under § 102(b), and we thus refer no further to that issue.

Whether claim 1 is infringed by Atlantic's accused product, and whether Eaton's commercially successful product is an embodiment of the invention claimed (the latter being germane in this case to the validity of the patent under § 103), depend on what is meant by "a plastic flow temperature above 120°F." As we will explain below, the correct meaning of that term is established by reading the prosecution history of the '584 patent. That is a legal exercise which we are obligated to conduct independently. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir. 1995), *aff'd*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

## II

The district court construed the limitation "a plastic flow temperature above 120°F," with reference to the claimed adhesive, to mean:

> [T]hat the adhesive has a flow characteristic which enables the trap product to be shipped and stored at the highest ambient temperature expected to be encountered in connection with such shipping and storage, namely 120°F, without the adhesive flowing from the support.

> A pressure sensitive adhesive material in a trap for catching mice or rats, in accordance with the invention in Eaton's '584 patent, has a plastic flow temperature

above 120°F if the adhesive passes the two tests established by Mr. Kenneth A. Nelson ..., namely (1) disposing a support, such as a tray, and the adhesive therein in an inverted horizontal orientation on an underlying substrate and exposing the support and adhesive to a temperature of 120°F for sixteen (16) hours, and (2) disposing a support, such as a tray, and the adhesive therein in a vertical orientation on an underlying substrate and exposing the support and adhesive to a temperature of 77°F for sixty-three (63) hours. An adhesive passes these tests and has a plastic flow temperature above 120°F if the adhesive does not flow from the support onto the underlying substrate during the test. These two tests are set forth in the file history of Eaton's '584 patent.

In addition, the district court cited another test to determine if an adhesive has a plastic flow temperature above 120°F. That test, devised by Findley Adhesives, Inc., called for heating the adhesive to 250°F for one-half hour, allowing the adhesive to set at room temperature for 24 hours, then disposing the adhesive in an inverted horizontal orientation at a temperature of 120°F for 16 hours. With regard to those tests, the district court held that:

> The two tests devised by Mr. Nelson and the test procedure established by Findley Adhesives, Inc. are appropriate for determining that an adhesive has a plastic flow temperature of 120°F in accordance with the invention claimed in the '584 patent.

Based on undisputed testimony offered by Eaton, Atlantic's mousetraps—when subjected to these tests—were found to infringe claim 1. As we will explain below, however, these tests cannot, as a matter of law, be the measurement for determining if an adhesive meets the plastic flow temperature limitation of claim 1, because the tests do not measure plastic flow at 120°F in a vertical orientation, which is required when the claim is properly construed.

After a thorough analysis of the prior art, the district court found the "primary indicia of patentability ... lacking," *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776

F.2d 281, 306, 227 USPQ 657, 675 (Fed.Cir. 1985), for claim 1, and that the claim would have been obvious when viewed in the light of the prior art and the level of skill in the art. Nevertheless, the district court held the patent nonobvious because of the strong commercial success of Eaton's commercial product. The finding of commercial success was based on Eaton's $17 million of sales from 1979 through 1984, and its $4 million of annual sales from 1985 through 1989.

### III

The '584 patent emerged from claims originally set forth in Patent Application No. 338,621, which is a continuation of Ser. No. 53,381, filed on June 29, 1979. The examiner rejected the claims, *inter alia*, for failure to disclose the best mode of making the invention. The Nelson tests, used by the district court as the measurement of plastic flow temperature, assessed prior art adhesives and an adhesive which Nelson's employer, Findley Adhesives, had been requested by Eaton to prepare that would meet the limitations of claim 1. Even though Eaton had expressly directed Nelson to test the adhesives for plastic flow at 120°F in an orientation other than horizontal, Nelson's test results did not refer to any tests or test results at 120°F in a vertical orientation. Instead, the only 120°F test performed by Nelson was on adhesive in a horizontal orientation. Nelson's tests for plastic flow in a vertical position at 77°F were unrelated to the 120°F plastic flow limitation in the '621 application, and were not requested by the performance specifications supplied to Nelson by Eaton. The results of Nelson's tests, as well as his test protocols, were introduced by the applicants to overcome the best mode rejection and to show that prior art adhesives failed to meet the Nelson tests.

The examiner, however, was troubled by the information disclosed in the Nelson tests. In particular, the examiner noted that one of the prior art adhesive traps tested by Nelson anticipated the claims under 35 U.S.C. § 102 (1994). Accordingly, the examiner requested additional tests by Nelson from the applicants to overcome the rejection. Eaton's attorney communicated the examiner's concerns to Nelson by letter dated November 6, 1981, which was introduced at trial on the public record as Defendant's nonprivileged Exhibit 197. In that letter, Nelson was instructed by Eaton's counsel to perform additional tests on the prior art adhesive. In particular, the attorney noted the need for a 120°F test with the adhesive vertically oriented. The attorney recommended a vertical 120°F test "for a period of a day or several days." Whether Nelson performed the particular vertical tests requested by Eaton's attorney is unknown, and the prosecution history of the '584 patent contains no reference to the results of such vertical tests. The examiner rejected the claims for failure to disclose best mode, nonenablement of the adhesive, and obviousness over the prior art.

On appeal to the Board of Appeals of the U.S. Patent and Trademark Office (Board), the claims were held not prima facie obvious over the prior art, and in any event not obvious because of the commercial success of Eaton's products. The applicants, in their brief to the Board, stated that the adhesive claimed must not flow when exposed to 120°F in vertical orientation, even for unlimited periods of time. The requirement that the claimed adhesive not flow when exposed to 120°F in a vertical orientation had been noted several times during prosecution up to the filing of the applicant's brief to the Board, and the same point was emphasized throughout subsequent prosecution proceedings. For example, the applicants stated in their brief to the Board:

> Also importantly, the adhesive must have temperature-flow characteristics such that *even if the surface of the adhesive is vertical,* the adhesive will not flow or sag at ordinarily encountered ambient storage temperatures (less than 120°F). That is to say, the plastic flow temperature of the adhesive must be above 120°F. [Emphasis added.]

On another occasion, in its statement to the Patent Office dated November 19, 1985, the applicant distinguished prior art references on the basis that:

> Nowhere in any of these references is there any mention whatsoever of a body of adhesive having a particular plastic flow

temperature which enables a vermin trap to be shipped and stored in *positions other than horizontal* at the highest ambient temperature expected to be encountered in connection with such shipment and storage without the body of adhesive running from the support therefor. [Emphasis added.]

In sum, the prosecution history abounds with unambiguous declarations by the applicants that their claimed traps would reasonably be exposed to 120°F when vertically oriented. That history is consistent with the evidence introduced at trial showing Eaton's repeated efforts to test adhesives at 120°F in vertical orientations, and refutes any notion that Eaton's only vertical flow concerns were satisfied by Nelson's 77°F vertical test. However, despite the applicants' repeated emphasis on the requirement that the adhesive not flow when exposed to 120°F in a vertical orientation, the file history contained no reference to any vertical test at 120°F when the '584 patent issued on March 27, 1984.

In July of 1985, a request for reexamination was filed by Hampton Chemical, Inc., based on several prior art references not previously considered by the examiner or the Board. For purposes of our review, two items of the prior art are of concern: two U.K. patents, disclosing an adhesive in a mousetrap, and a domestic adhesive product, Formula 31, which were said to render obvious the mousetrap claimed in the '584 patent.

## IV

When the patent was subjected to reexamination, the applicants, Hampton Chemical, and the examiner knew that the invention as claimed specified that the adhesive not flow when exposed to 120°F in any orientation, including vertical. However, before the reexamination proceedings, no reference had been made in the file history to any test of plastic flow at 120°F when the material is vertically oriented. All previous references to plastic flow in a vertical orientation were with respect to relatively long-term exposure at ambient room temperatures. In particular, the earlier references to vertical plastic flow cited the Nelson tests, which exposed the adhesive to 77°F for 63 hours. The concern over possible flow at room temperature after exposure for several days stemmed from the inventors' understanding that at commercial points of sale, the packaged traps might remain suspended vertically for such times. The 77°F test, while of interest to the inventors for shelf life marketability of their product, is irrelevant to the determination of whether an adhesive will flow when exposed to 120°F for any period of time. In short, claim 1 of the '584 patent cannot be enforced against a mousetrap product with an adhesive which passes Nelson's 77°F vertical test, but which fails the 120°F test. Nor can a product which passes the 77°F test, but which fails the 120°F limitation, be used to demonstrate commercial success of the invention as part of a defense to legal challenge under § 103.

Before reexamination, a competitor of Eaton wishing to avoid infringement of claim 1 would not have known how to test his product to determine if it satisfied the 120°F limitation when the adhesive is vertically oriented. Indeed, such a competitor, Southern Mill Creek Productions Company, Inc., had already appeared, in protest to the application before the patent issued, complaining that "nowhere in the confines of this Application have Applicants defined how one might measure the flow temperature of the pressure-sensitive adhesive material." The applicants, however, took no steps to disclose a test protocol for measuring plastic flow at 120°F in a vertical orientation. The record in this case reflects that Eaton learned in 1983, while Southern Mill's complaint was pending, and before issuance of the patent, that its own product failed the 120°F flow test when exposed vertically for 16 hours. We do not know, however, whether that fact affected Eaton's failure to disclose a 120°F vertical test protocol to the examiner.

## V

During reexamination, Hampton Chemical sought to prove that Eaton's claimed mousetrap employing a special adhesive was rendered obvious in view of the two U.K. patents and Formula 31. To make its case, Hampton employed one of ordinary skill in the art, Donatas Satas, to test the adhesive

disclosed in the U.K. patents. Satas selected the test protocol for the 120°F limitation, and determined that the adhesive should be tested for flow at 120°F for 24 hours in a vertical orientation, and for 12 hours at 120°F in an inverted horizontal orientation. Satas concluded that the prior art adhesives so tested met the limitations of claim 1.

Eaton, also in the reexamination, sought to prove that Formula 31 did *not* meet the limitations of claim 1. Toward that end, Eaton hired John M. Questel, also one of ordinary skill in the art, to test Formula 31. Questel's tests were performed under his supervision by his employee, Lore Hise. The test protocol selected by Questel exposed the adhesive to 120°F for 24 hours in both horizontal and vertical orientations. Questel concluded that Formula 31 did not meet the limitations of the claim, and that he lacked sufficient information to comment— one way or another—on the conclusion reached by Donatas Satas on the adhesive disclosed in the U.K. patents.

On March 10, 1986, the examiner rejected the claims on reexamination as obvious under § 103 over the references brought to the examiner's attention by Hampton Chemical. Eaton responded to that rejection, arguing that Questel's tests had shown Formula 31 not to be invalidating prior art, and that Satas's test results were inconclusive. In its response, Eaton relied on the Questel tests, and notably, did not question the propriety of the test protocols employed by Satas. From this episode in the file history of the '584 patent, a reasonable competitor of Eaton would surmise that Eaton would measure satisfaction of "a plastic flow temperature above 120°F" by testing accused adhesives at 120°F for 24 hours in both vertical and horizontal orientations. In short, after seven years of patent application prosecution, the file history clearly supplied the missing vertical 120°F test parameter and a corresponding horizontal test.

## VI

The final chapter of the file history of the '584 patent is the second appeal to the Board following another rejection of the claims by the examiner as obvious over the prior art, including the U.K. patents and Formula 31. Both Eaton and the examiner again relied on the Questel tests, with Eaton arguing the tests showed that the prior art failed to meet the 120°F claim limitation, and the examiner arguing that the tests showed the prior art met the limitation. The Board, during the course of its detailed review of the prior art, relied on the 24–hour parameter in the Questel tests in concluding that the adhesive in Formula 31 met the 120°F limitation. In light of the prior art, the Board concluded that the claims are prima facie obvious, but that the claims are nevertheless nonobvious under § 103 because of the commercial success of Eaton's product, as demonstrated to the Board by Eaton's submission of sales data and consumer testimonials. During this final chapter of the prosecution history, neither Eaton, the examiner, nor the Board referred to the then-ancient Nelson tests as the protocol for ascertaining the meaning of the 120°F claim limitation. Instead, there was unanimous recognition that the Questel test protocols were understood by one of ordinary skill in the art to define the 120°F claim limitation.

## VII

We now turn to the events at trial in the district court. Both Eaton and Atlantic offered testimony through expert witnesses about the meaning of the 120°F claim limitation. "Plastic flow temperature above 120°F" is a term with no previous meaning to those of ordinary skill in the art. Its meaning, then, must be found somewhere in the patent. *See* 35 U.S.C. § 112, ¶ 2 (1994) (inventor must particularly point out and distinctly claim the subject matter of his invention); *In re Paulsen*, 30 F.3d 1475, 1480, 31 USPQ2d 1671, 1674 (Fed.Cir.1994) (inventor as lexicographer must define his terms in the patent disclosure). Both expert witnesses understood that the adhesive in claim 1 had to withstand plastic flow at 120°F when subjected to horizontal and vertical tests. Both witnesses also understood that the claim prohibits plastic flow at 120°F after the adhesive has been exposed to the specified degree of heat for such reasonable periods of time as

the commercial product might experience during shipping and storage.

The experts, however, disagreed over the length of time that the patented product might remain exposed to 120°F during shipping and storage. Eaton's expert, Richard Muny, testified regarding adhesive tests that he had been asked to run on Eaton's products and the accused products of Atlantic. Muny testified that he took no part in selecting the test protocols; instead, he simply ran his tests using protocols given to him by Findley Adhesives at the direction of Eaton. The tests used by Muny were those devised by Nelson (horizontal at 120°F for 16 hours and vertical at 77°F for 63 hours), plus a vertical test at 120°F for 5 hours. Muny did not explain why he was asked to conduct the 120°F vertical test. Muny also testified that it might go "too far" to describe these Findley tests as standard quality control procedure. Muny, however, testified that in his opinion the tests he had been asked to run reflected the time periods during which the products might be expected to be exposed to 120°F when in shipment or storage.

Dr. Harold Zeliger testified that he had been retained by Atlantic to devise and carry out tests to demonstrate whether the products of Eaton and Atlantic met the limitations of claim 1. Zeliger read claim 1 to require the adhesive to resist plastic flow when exposed to 120°F in a vertical orientation. Zeliger did not state whether he tested any product for plastic flow when in a horizontal orientation. His tests exposed six commercial products of both Eaton and Atlantic to 120°F, vertically oriented in their packages of two trays facing one another. Zeliger periodically examined the products being tested to determine if they had experienced plastic flow. Zeliger concluded that an adhesive "failed," when the adhesive in the two trays flowed into each other. According to Zeliger's tests, two of Eaton's products resisted plastic flow for 44 hours, but the other four Eaton products "failed," or flowed, one after 11 hours and the other three after 20 hours. Of Atlantic's accused products, one failed after 24 hours, three failed after 11 hours, and two failed after 20 hours.

Zeliger testified that, in his view, all of the products of Eaton and Atlantic failed during times he considered reasonable times when the adhesives would be exposed to 120°F during shipping and storage. Zeliger expressly disagreed with Muny's conclusion that five hours of exposure at 120°F was the reasonable maximum exposure time. Zeliger testified that a five-hour time limit was not indicative of real world conditions. On cross-examination, Zeliger admitted that in real world conditions, one would not find exact temperatures of 120°F maintained evenly over periods of time. Zeliger thus cast some doubt on his own tests as effective measurements of actual shipping and storage conditions.

After hearing all the testimony, the district court rejected Zeliger's view that infringement of claim 1 should be measured by the length of time required for the adhesive in the trap to flow when exposed to 120°F in a vertical position. The district court also rejected the portion of Muny's tests that had subjected Atlantic's traps to 120°F in a vertical orientation for five hours. Instead, the district court held that Nelson's tests, as conducted by Muny, proved that Atlantic's product infringed claim 1. For the reasons explained above, the district court's reliance on the Nelson tests is legal error, since those tests fail to subject the claimed adhesive to 120°F when vertically oriented.

If Muny is correct that his five-hour vertical test and a 16–hour horizontal test satisfy claim 1, Atlantic's accused product would infringe claim 1 because Atlantic apparently concedes the 16–hour, 120°F horizontal measurement and Zeliger proves that at least some of Atlantic's product survives for five hours when tested vertically. If, however, Zeliger is correct that the reasonable times for exposure at 120°F can vary, and that his failure times are all within a zone of reasonable exposure times, then none of Atlantic's product infringes claim 1. Eaton's own product also would not meet the limitations of claim 1, and Eaton would thus be unable to claim commercial success of that product to establish that claim 1 is not obvious under § 103.

■ We may not rely on either Muny or Zeliger, because, as we have often stated, trial testimony regarding the meaning of a claim cannot vary the meaning of a claim that is established either by the claim itself or by the claim as correctly understood by reference to the specification and the file history. *See Senmed, Inc. v. Richard–Allen Medical Indus., Inc.*, 888 F.2d 815, 819 n. 8, 12 USPQ2d 1508, 1512 n. 8 (Fed.Cir.1989); *see also North Am. Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1577, 28 USPQ2d 1333, 1337 (Fed.Cir.1993) (patentee cannot take one position before the Patent Office and a different position before the court); *Jonsson v. Stanley Works*, 903 F.2d 812, 820–21, 14 USPQ2d 1863, 1871 (Fed.Cir.1990) (same).

For the reasons set forth above, we have concluded that the district court erred, as a matter of law, when it construed the term "a plastic flow temperature above 120°F'" to exclude any amount of plastic flow when the adhesive is exposed to 120°F in a vertical orientation. The 120°F vertical tests proposed by Muny and Zeliger are also legally insufficient; Muny's because it sets the time for horizontal and vertical testing incorrectly, and Zeliger's because it sets no times for testing, but simply tests until failure, and then asks if the time to failure is within reasonable real world exposure times. While Zeliger's test may have some common sense appeal, it provides no certainty to Eaton's competitors, who are entitled to know the point in time at which their products will infringe claim 1. Nor does Zeliger's test give any measure of certainty to Eaton, which is also entitled to know in advance how to test competing product for infringement of claim 1.

In this case, the dispositive claim limitation is a term unknown to those of ordinary skill in the art at the time the patent application was filed. It thus fell to the applicants, as a duty, to provide a precise definition for the 120°F limitation. Early in the prosecution history of the '584 patent, a competitor noted the absence of any definition of the key term. The applicants' proffer of the Nelson tests did not respond properly to the competitor's plea, because the Nelson tests failed to sup-ply a test parameter for flow at 120°F when the adhesive is vertically oriented. The record in this case amply demonstrates that the applicants intended their adhesive to withstand plastic flow at 120°F when vertically oriented. Their disclosures to the examiner repeatedly stated that intention, as did their testing of products, demonstrated by evidence submitted at trial, for flow at 120°F when vertically oriented. The applicants were obligated to give a meaning to the key limitation during the prosecution history, and they did so with the Questel tests.

## VIII

Having concluded that "a plastic flow temperature above 120°F'" means that the adhesive must resist flow when exposed for 24 hours to 120°F in both horizontal and vertical orientations, we now review the holdings of the district court that Atlantic's accused products infringe claim 1, and that the claims of the '584 patent are not invalid as obvious under § 103.

### A

■ Zeliger's tests on Atlantic's product prove that at least one such product resisted plastic flow when exposed for 24 hours to 120°F in a vertical orientation. There is no proof in the Zeliger tests, however, that the same product resisted plastic flow when exposed to 120°F for 24 hours in a horizontal orientation. The Zeliger tests thus cannot serve as the factual basis to demonstrate that Atlantic's product infringes claim 1, as correctly interpreted. The burden rested with Eaton, throughout the trial, to prove that Atlantic's mousetraps met each limitation in claim 1. Eaton knew, from at least the final chapter of the prosecution history, that its claim required the adhesive to resist plastic flow when subjected to 120°F in both vertical and horizontal orientations. Instead of testing Atlantic's product for infringement under the protocols disclosed in the prosecution history, Eaton erroneously sought to make its case on the basis of Nelson's 16–hour horizontal test and the 5–hour vertical test run by Muny. Having reviewed the trial record and found no evidence that Atlantic's product meets the 120°F limitation as cor-

rectly interpreted, we have no choice but to reverse the district court's judgment of infringement.

B

Whether Eaton could succeed on its claim of infringement by Atlantic also depends on whether it can overcome Atlantic's challenge to the validity of the '584 patent. As noted above, the district court concluded that the '584 patent would have been invalid as obvious under § 103 but for the commercial success that Eaton's products have enjoyed since their introduction to the marketplace. The district court carefully reviewed the prior art pursuant to which it reached that conclusion. That review repeated the review conducted by the Board in the second appeal, at the conclusion of which the Board also determined that but for the commercial success the claims in suit would have been invalid for obviousness. We need not repeat for a third time the analysis of the prior art, with which we agree. The only pertinent issue under § 103 is whether the evidence of commercial success introduced at trial is legally sufficient to support the conclusion of the district court that the '584 patent would not have been obvious under § 103.

■■■ Just as no product can infringe claim 1 unless the product resists plastic flow when exposed vertically and horizontally at 120°F for 24 hours, Eaton cannot demonstrate commercial success, for purposes of countering the challenge of obviousness, unless it can show that the commercial success of the product results from the claimed invention. Furthermore, the asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art. *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580, 219 USPQ 8, 12 (Fed.Cir.1983) (claims held obvious despite purported showing of commercial success when patentee failed to show that "such commercial success as its marketed system enjoyed was due to anything disclosed in the patent in suit which was not readily available in the prior art"). When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the

successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392–93, 7 USPQ2d 1222, 1226–27 (Fed.Cir. 1988). If a patentee makes the requisite showing of nexus between commercial success and the patented invention, the burden shifts to the challenger to prove that the commercial success is instead due to other factors extraneous to the patented invention, such as advertising or superior workmanship.

At trial, Atlantic argued that Eaton's evidence of commercial success is legally insufficient, and, therefore, that the '584 patent is invalid for obviousness. The district court correctly noted that Eaton carries the burden of demonstrating that the "thing ... that is commercially successful is the invention disclosed and claimed in the patent." *Demaco*, 851 F.2d at 1392, 7 USPQ2d at 1226. The significant sales of Eaton's "Stick–Em" glue traps were held by the district court to establish the requisite nexus because the adhesive "does not flow out of the trap but stays put to catch the vermin." In this case, Eaton's primary showing of commercial success seems limited to the sales of the Stick–Em product which satisfied the Nelson tests. Because the Nelson tests do not correctly define the 120°F limitation in claim 1, they cannot serve to assist Eaton in making its nexus case. Zeliger's tests, however, suggest that certain of Eaton's products may embody the claimed invention, and for that reason, we conclude that the issue of nexus should be reexamined on remand. If Eaton can demonstrate that the commercial success of its product derives from the claimed invention and is attributable to something disclosed in the patent that was not readily available in the prior art, it is entitled, on the record in this case, to the presumption that the commercial success of its product is attributable to its patented invention.

At trial, the district court held that the volume of Eaton's sales satisfied the requirements to show commercial success. The district court also rejected the reasons advanced by Atlantic to prove that the commercial success was due to advertising and other

factors, instead of resulting from the patented invention. We agree with the district court in these respects and affirm its decision that the sales evidence in this case shows success and that Atlantic's other explanations of success cannot overcome a properly grounded presumptive showing of nexus between the commercial success and the claimed invention. We disturb only the holding that Eaton proved a presumptive nexus between the sales of its product and the invention claimed.

On remand, Eaton will have an opportunity to renew its assertion that the commercial success of its product, as shown by the evidence introduced at trial, demonstrates the lack of obviousness of the '584 patent. Atlantic will have a corresponding opportunity to challenge Eaton's renewed assertion.

### IX

Based on the correct interpretation of claim 1, the judgment of infringement is reversed, and the judgment that the '584 patent is not invalid under § 103 is vacated. The case is remanded to the district court.

No costs.

*REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.*

RADER, Circuit Judge, dissenting.

Two inventors at J.T. Eaton & Company, Inc. (Eaton) built a better mousetrap and, as promised in the old adage,* the world beat a path to their door. In an effort to reap its rightful reward for advancing the state of the art, Eaton surmounted extensive legal hurdles. Eaton persevered through eight years of patent prosecution in the Patent and Trademark Office (PTO). After a competitor protest, two reexamination proceedings, and two appeals, the Board of Patent Appeals and Interferences (Board) twice confirmed the patentability of Eaton's invention. Thereafter, Eaton spent twelve years in district court proceedings, ultimately winning a judgment of infringement against its competitor, Atlantic Paste & Glue Company, Inc. (Atlantic). All this effort, however, came to naught when this court concocted its own novel interpretation of the lengthy prosecution history of Eaton's patent. Based on its reading of the administrative record, this court arrives at a claim interpretation that no party advocated throughout the protracted history of this patent and is likely to cover neither Eaton's nor Atlantic's products.

To reach its idiosyncratic claim interpretation, this court relies on a few isolated excerpts from over 1400 pages of prosecution history. In particular, this court abstracts two paragraphs from an eleven-page declaration of John M. Questel, filed in the second reexamination, to convert a stringent vertical flow test into a claim requirement. In fact, neither Eaton, nor the Board, nor even Mr. Questel himself, relied on his 120°F vertical flow test to distinguish prior art. The administrative record, when considered as a whole, does not support this court's adoption of this test as the measure of Eaton's claims.

This court need not have strained to interpret the claims. The patent record—the claims, specification, and prosecution history—provides ample support for the claim interpretation adopted by the United States District Court for the Eastern District of New York. In fact, the examiner, the Board, and at least two federal judges have already accepted the same interpretation—a reading

---

* The exact development of the adage remains a mystery. American essayist and poet Ralph Waldo Emerson (1803–1882) wrote in an 1855 essay in *Journals:*

> I trust a good deal to common fame, as we all must. If a man has good corn, or wood, or boards, or pigs, to sell, or can make better chairs or knives, crucibles, or church organs, than any body else, you will find a broad, hard-beaten road to his house, though it be in the woods.

The mousetrap, however, did not appear until seven years after Emerson's death. Mrs. Sarah S.B. Yule, in her book *Borrowings* (1889), insisted that at a lecture Emerson had stated a catchier variation: "If a man write a better book, preach a better sermon, or make a better mousetrap than his neighbor, though he build his house in the woods, the world will make a beaten path to his door." More recently, in a twentieth century adaptation, Newman Levy wrote: "If a man builds a better mousetrap than his neighbor, the world will not only beat a path to his door, it will make newsreels of him and his wife in beach pajamas, it will discuss his diet and his health, it will publish heart-throb stories of his love life."

compelled by the prosecution history as a whole.

## I.

The phrase "plastic flow temperature" has no fixed meaning in the adhesive art. However, an inventor may freely define unfamiliar claim terms in the specification or in the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996); *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889–90, 221 USPQ 1025, 1031 (Fed.Cir.1984). Eaton took that course to define its claim term.

Eaton's Patent No. 4,438,584 (the '584 patent) distinguished its ready-to-use glue trap for mice and rats from the prior art with an adhesive having a "plastic flow temperature above 120°F." The inventors, Stanley and Benjamin Baker, recognized that the adhesives used in prior art traps would melt and flow at temperatures normally encountered during shipping and storage. The Bakers learned from the United States Department of Transportation that the maximum ambient temperature encountered during shipping was 120°F. To solve the problem with the prior art, the Bakers set out to stabilize their adhesive at temperatures up to 120°F. Thus, the requirements of secure shipping became the benchmark for "plastic flow temperature."

Throughout the lengthy administrative proceedings, Eaton and the PTO clarified this meaning of plastic flow temperature. For example, in its Amendment filed July 24, 1981, Eaton explained:

> [B]ecause the plastic flow temperature is above 120°F, the body of the adhesive will not flow plastically at normally encountered ambient temperatures while being shipped or stored. The traps can be disposed horizontally, upside down or vertically at normally encountered temperatures with no fear of touching of adjacent surfaces or the adhesive of one trap to the other.

Thus Eaton explained that its claimed adhesive would not flow upside-down or "vertically at normally encountered temperatures."

To underscore this message, Eaton submitted the declaration of Kenneth A. Nelson, the chemist who developed the claimed adhesive. Mr. Nelson's declaration disclosed a two-prong test for the claim requirement. That test requires, first, placing a 1/16 inch layer of adhesive upside-down in an oven preheated to 120°F for sixteen hours. Second, the test requires that the adhesive be hung vertically in an oven at 77°F for sixty-three hours. An adhesive meets Eaton's requirement if the glue does not flow from the tray during either of these tests.

The Board understood and accepted this specific definition of plastic flow temperature. In its November 30, 1983, opinion, the Board recognized "plastic flow temperature" as the "characteristic of the adhesive ... required to prevent the adhesive from flowing or sagging at temperatures at which the trap is shipped, stored, or used." The Board noted that prior art publications did not anticipate Eaton's claims because they lacked adhesives with these plastic flow properties:

> Prior to the instant invention, glue traps were prepared by the user rather than the manufacturer in that ready made traps could not be readily shipped and stored. Workers in this art were working to find various means to solve these problems. Appellants recognized this problem and conceived of the idea embodied in the instant claims of utilizing an adhesive having special plastic flow properties.

Thus, the full administrative record gives an explicit and reasonable meaning of "plastic flow temperature" that focuses on shipping and storage of the commercial trap product without adhesive spillage. Mr. Nelson's two-prong test makes Eaton's definition unmistakable to one of skill in the art. For this reason, the Eastern District of New York adopted the Nelson tests as the definition of "plastic flow temperature." Indeed, another district court interpreted "plastic flow temperature" in the same '584 patent precisely in accordance with Mr. Nelson's declaration. *See J.T. Eaton & Co. v. Bell Lab., Inc.*, No. 95–C–0441–S (W.D.Wis. March 29, 1996) (oral jury instructions). Thus, the examiner, the Board (twice), and

two district courts read the plastic flow limitation in accordance with the Nelson tests.

Trial testimony from one skilled in the art confirmed the logic of this uniform claim interpretation. According to this testimony, Mr. Nelson's sixteen hour inverted horizontal test at 120°F properly tested the product under typical shipping conditions. After all, elevated temperatures would not last longer than normal daylight hours. Testing the adhesives beyond sixteen hours made little sense in the context of shipping these products in trucks and boxcars. Likewise, according to the same testimony, the lengthy vertical test at 77°F properly reflected the prolonged periods of shelf storage at normal room temperatures. Given this logical explanation, there is little wonder every other agency and court that reviewed Eaton's claims accepted the same interpretation.

## II.

Despite the overall content of the prosecution history, this court stretched the vertical flow test concept out of proportion, exaggerated the stringency of that test beyond the realities of storage and shipping, and made it the sole talisman of the Eaton claim. In its brief, Atlantic urged this court to find a stringent vertical flow test in a single sentence of the voluminous prosecution history:

> Plastic flow temperature, as used herein, is that temperature below which the adhesive will not flow or sag even if stored with the surface of a thick (1/16 to 1/8 inch) layer of adhesive vertical for unlimited periods of time. (Applicant's Brief to Board of Patent Appeals and Interferences, December 27, 1982)

Based on this statement, Atlantic argued that an accused trap product could not infringe unless it could dangle in a vertical position at 120°F for an infinite period of time without any glue flow. Like the district court before it, however, this court recognized that one skilled in the art could not reasonably rely on such obvious hyperbole as if it affected the scope of the claim. *See Intervet Am., Inc. v. Kee–Vet Lab., Inc.*, 887 F.2d 1050, 1054, 12 USPQ2d 1474, 1477 (Fed.Cir.1989) (holding that claim language controls over an attorney's "erroneous remarks" made during the course of prosecution). Accordingly, the panel rejected this rationale. In so doing, it rejected the only claim interpretation proffered by Atlantic for "plastic flow temperature."

Without any basis in argument from either party or testimony from the trial record, the panel's ultimate claim construction rests on its own collection of orphaned passages from the file history. According to the panel, these passages show that Eaton did not provide a test for measuring vertical flow. To the contrary, Eaton provided Mr. Nelson's 77°F vertical test—a test designed for temperatures where the products are likely to hang on vertical displays. Nonetheless, this court created the myth of a "missing vertical test" to justify its reliance on two paragraphs in Mr. Questel's declaration (paragraphs 22 and 23)—a declaration filed two years after the '584 patent originally issued.

This court's reading of the record goes astray in several ways. First, nowhere does the '584 patent prosecution suggest the necessity of a 120°F vertical flow test. The "missing" test was not missing at all, but was simply not required by the claims. Before the PTO, Eaton consistently stressed that the Nelson tests defined "plastic flow temperature" under temperature conditions likely to be encountered during shipping and storage. Second, the brief extract from Mr. Questel's declaration simply lacks the meaning and the importance attributed to it by the panel.

### A.

The premise underlying this court's opinion is that Mr. Questel supplied a missing test for vertical flow two years after the patent issued. The panel divines this premise from a few passages in which Eaton generally describes the advantages of the claimed adhesive. For example, the panel opinion relies on Eaton's statements to the Board on December 27, 1982:

> Also importantly, the adhesive must have temperature-flow characteristics such that even if the surface of the adhesive is vertical, the adhesive will not flow or sag at ordinarily encountered ambient storage

temperatures (less than 120°F). That is to say, the plastic flow temperature of the adhesive must be above 120°F.

According to the panel, this quote demonstrates that "plastic flow temperature" had a vertical component that Mr. Nelson did not measure. To the contrary, Eaton did not shirk its duty to define the claim terms. In the very same 1982 brief, when actually distinguishing the prior art cited by the examiner, Eaton specifically cited to the Nelson tests as the definition of "plastic flow temperature."

The record is replete with other instances in which Eaton mentioned the word "vertical" in contexts fully consistent with using the Nelson tests as the measure of plastic flow temperature. For example, in its Amendment filed July 24, 1981, Eaton argued:

A trap made [in the manner described in the application] has been evaluated by Kenneth A. Nelson and found to have acceptable plastic flow characteristics. The trap can therefore be shipped or stored in vertical or inverted horizontal positions without fear of plastic flow and thus contamination of adjacent surfaces or spilling.

Eaton simply did not argue for its patent on the basis of some undefined vertical flow capabilities. Eaton had no need to test vertical flow above 77°F because its traps would be displayed vertically only at room temperature.

More importantly, the PTO understood this simple principle. The PTO did not understand Eaton to rely on a stringent vertical test for flow characteristics. Both the examiner and the Board expressly disclaimed any reliance on vertical or horizontal testing to determine patentability of the claimed invention. For example, the examiner stated on May 27, 1986:

[W]hether the body tests were done in vertical, inverted horizontal or flat horizontal position has no relevance. The claims do not specify what position the adhesive is in regarding vertical flow.

The Board expressed a similar view in its January 16, 1987, decision on the second reexamination:

The claims on appeal do not include any limitations restricting the orientation of the commercial trap product defined therein to any particular horizontal, vertical, or inverted disposition, nor are there any limitations requiring flow of the adhesive from the container to be prevented for any particular length of time.

These passages make absolutely clear that the PTO did not decide to issue the '584 patent based on any of Eaton's statements about vertical flow or any of Mr. Questel's tests. Instead, it is this court that first imports into the claims a supposed limitation from the prosecution history—a limitation on which neither the applicant nor the PTO relied during acquisition of the patent.

In fact, the PTO never objected to the phrase "plastic flow temperature" as indefinite for lack of a vertical flow test. If vertical flow was the pivotal claim parameter perceived by this court, then the PTO should have noted its absence. Instead, the lengthy prosecution culminated in the issuance of the '584 patent without so much as a mention of a mythical "missing" vertical test.

Finally, Eaton did not, as the panel suggests, switch its focus from the Nelson tests to the Questel tests during the final chapter of the prosecution. Rather, at the conclusion of the second reexamination, as at the beginning, Eaton relied on its consistent definition of plastic flow temperature:

The terminology "plastic flow temperature" in appellants' claims on appeal has that meaning which is made clear elsewhere in the patent or in the file wrapper.... Appellants defined their terminology "plastic flow temperature" throughout the prosecution of their application which matured as the subject patent as being a characteristic of the adhesive which would prevent the adhesive from sagging or flowing from its support at temperatures at which their product is shipped, stored, or used.

This passage shows that Eaton did not attempt to switch arguments on the PTO in the closing chapter of the prosecution.

Perhaps aware of the danger of stringing together isolated passages out of context,

this court tries to correlate these passages by reference to private communications between Eaton's lawyers and scientists. Specifically, the panel relies on Eaton's attorney's instructions to Mr. Nelson about vertical flow testing. Far from supporting the missing test myth, this tactic betrays this court's flawed method of seeking claim meaning. These privileged exchanges are not part of the public record. Even if Eaton's attorneys believed patentability turned on vertical flow at 120°F, such private correspondence, not a part of the · public record, cannot possibly supply evidence of claim meaning. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed. Cir.1995) (patent claims are construed in light of the public record), *aff'd,* —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Thus, this court relies not only on out-of-context extracts, but on extracts without any relevance to claim interpretation. Indeed, few of the isolated passages on which this court relies had anything to do with the meaning of the plastic flow characteristic. Neither Eaton nor the Board relied on the passages to which this court attaches dispositive significance.

For all these reasons, I must conclude that this court has created a requirement for a stringent vertical flow test that the claims, read in light of the prosecution history, do not require. Had Eaton truly acquired its patent by requiring such a test, the record would surely contain far more emphatic evidence than the few isolated passages cited in the panel opinion. *See York Prods., Inc. v. Central Tractor Farm & Family Center,* 99 F.3d 1568, 1575, 40 USPQ2d 1619, 1624 (Fed. Cir.1996) ("Unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage.").

### B.

Without doubt, the precedent of this court indicates that a patentee's remarks during patent prosecution can illuminate the meaning of the claims. *See Markman,* 52 F.3d at 980; *Vitronics,* 90 F.3d at 1582–83. However, our precedent makes equally clear that this court construes an administrative record in its full context, not on the basis of snippets lifted out of context. *See Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1565, 19 USPQ2d 1500, 1506 (Fed.Cir.1991) ("We construe claims in the light of the language of the claim itself, the specification on which it is based, and the whole prosecution history.") (Rich, J., dissenting); *see also Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 292, 36 USPQ2d 1095, 1100 (Fed.Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996). Moreover, the reviewing court must examine the full context of prosecution history to discern not only what the applicant said, but why he said it. *Cf. Hebert v. Lisle Corp.,* 99 F.3d 1109, 1118, 40 USPQ2d 1611, 1617 (Fed.Cir.1996) ("It is of course necessary to consider not only the amendments to the claims but the reason why they were made . . . .").

These basic legal principles disclose the infirmity of the court's reliance on two paragraphs from a single declaration at the end of the second reexamination. A fair reading of the declaration indicates that Mr. Questel distinguished the prior art Formula No. 31 adhesive on two grounds: (1) it exhibited unacceptable levels of cold flow (i.e., 72°F) in a vertical orientation; and (2) it exhibited unacceptable levels of hot flow when tested at 100°F in a vertical orientation. Thus, although Mr. Questel conducted twenty-four hour vertical tests at 120°F, neither he nor Eaton ever relied on such tests to distinguish any prior art. Nor did Mr. Questel in any way suggest that he considered a twenty-four hour vertical test at 120°F to be the measure of "plastic flow temperature." This record simply does not support the court's conclusion that Eaton's claims are measured by the 120°F vertical flow test. *See Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 93 F.3d 1572, 1581, 40 USPQ2d 1019, 1025–26 (Fed.Cir.1996) (looking to "the prosecution history as a whole" to determine how one skilled in the art would understand a claim term) (Clevenger, J.).

Sadly, this court's fixation on the 120°F vertical flow test foreclosed the one claim construction that was used repeatedly by all parties throughout the public record. The district court properly used that claim inter-

pretation. This court errs in departing from the full context of the administrative record, and importing a false limitation from the prosecution history.

## III.

Finally, even if I agreed with the panel's claim construction, I could not join a reversal of the district court's finding of infringement. This court decides this issue against Eaton on the basis of a failure of proof—that is, Eaton's failure to prove infringement under a claim meaning no one had ever imagined before this court's pronouncement. The panel reasons that Eaton should have known this court's interpretation of the claims, and therefore had the burden of presenting adequate proof of infringement. Contrary to this assumption, no patentee in Eaton's position could have predicted this court's peculiar claim construction. Even Atlantic, a company with a strong incentive to adopt any argument to avoid infringement, did not proffer this court's late-coming interpretation.

In light of the time and resources invested in this patent and this infringement battle, this court might at least have afforded Eaton an opportunity to present evidence of infringement under this panel's novel claim construction. Accordingly, even if I could accept the court's claim meaning, I would remand the case for further proceedings.

## IV.

This decision stands as a monument at the troubled intersection between legal and factual analyses in this court's post-*Markman* jurisprudence. That claims must be construed by the court does not divorce the interpretive process from a host of inherently factual subsidiary matters, such as how one skilled in the art would understand claim terms and prosecution history statements. *Markman v. Westview Instruments, Inc.*, — U.S. —, — – —, 116 S.Ct. 1384, 1395–96, 134 L.Ed.2d 577 (1996) ("We accordingly think there is sufficient reason to treat construction of terms of art like many other responsibilities that we cede to a judge in the normal course of trial, notwithstanding its evidentiary underpinnings."). This court's role in reviewing claim meanings dis-

cerned by the district courts calls for modesty and restraint—born not of timidity, but of recognition of the limits inherent in appellate review. When an appellate court arrives at a novel claim interpretation after nearly twenty years of prosecution and litigation, it is inadequately equipped to test its new and unprecedented reading against the views of those skilled in the art. I believe the court today has overstepped the boundaries of effective appellate review.

Perhaps this court was influenced by the district court's finding that, but for the commercial success of Eaton's trap products, the '584 patent would be obvious. Unfortunately, this court does not address the issue of obviousness directly, *see, e.g., Newell Cos., Inc. v. Kenney Manufacturing Co.*, 864 F.2d 757, 768–69, 9 USPQ2d 1417, 1426–27 (Fed. Cir.1988) (concluding that the patent-in-suit was *obvious despite strong evidence of commercial success*), but instead distorts claim interpretation techniques to defeat infringement. Although sensitive to questions about the validity of the '584 patent, I believe that the court should not give voice to those questions by means of a disingenuous reading of the prosecution history. Accordingly, I must respectfully dissent.