**NEUPAK, INC., Plaintiff– Cross Appellant,**

v.

**IDEAL MANUFACTURING AND SALES CORP., Defendant– Appellant.**

No. 01–1368, 01–1389.

United States Court of Appeals, Federal Circuit.

DECIDED: June 24, 2002.

Rehearing Denied July 19, 2002.

Before CLEVENGER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

Ideal Manufacturing and Sales Corporation appeals from a judgment of the United States District Court for the District of Minnesota. The court held that U.S. Patent No. 5,505,233 ("the '233 patent"), which is assigned to Neupak, Inc., is neither invalid nor unenforceable, and that Ideal is not entitled to attorney fees. Neupak cross-appeals from another portion of the district court's judgment dismissing Neupak's patent infringement claims. We *affirm.*

I

Neupak's patent relates to a "mobile and flushable container filling unit," a device used to fill containers, such as paint cans, with fluid. The patent discloses a machine that is movable from the filling position to a position where it can be cleaned or stored in preparation for use.

In 1996, Neupak filed this action, alleging that Ideal had manufactured and sold "lateral transfer fillers" embodying the inventions of the '233 patent. Ideal then requested that the United States Patent and Trademark Office ("PTO") reexamine the patent. The PTO conducted a reexamination, during which the lawsuit was suspended. At the conclusion of the reexamination, the PTO issued a reexamination certificate, in which several of the original claims of the patent were canceled, the remainder were amended, and several new claims were added. When the lawsuit resumed, Ideal amended its answer to include a counterclaim for a declaratory judgment that the asserted claims of the reexamined patent were invalid and that the patent was unenforceable because of inequitable conduct on Neupak's part.

On a motion for partial summary judgment, the district court entered an order holding that the asserted claims of the '233 patent had been substantively changed during reexamination. The effect of that order was to bar, under 35 U.S.C. § 307(b), Neupak's claims for damages during the period prior to the issuance of the reexamination certificate. The court then dismissed Neupak's infringement claims.

Following a bench trial on Ideal's counterclaim, the court entered an order holding that the claims of the reexamined patent were not invalid and not unenforceable for inequitable conduct. Ideal has appealed from that order, while Neupak has cross-appealed from the district court's order that claim 7 of the '233 patent was substantively changed during reexamination.

II

A

■ Representative claim 8 of the reexamined '233 patent reads as follows, with emphasis placed on the claim terms disputed in this appeal:

8. Apparatus for filling containers with liquid products, comprising:

means defining a filling position for such containers and comprising means supporting such containers,

a source of the liquid product to be supplied into the containers and flow means through which the liquid product is supplied,

sensing means disposed at the filling position for determining the filling of the containers, comprising a plurality of load cells, each for a separate container;

first and second *mobile filling units transportable relative to said filling position,* to said source of liquid product, and to said sensing means, said mobile filling units comprising movable floor engaging means supporting the filling units, and comprising a plurality of liquid product dispensing heads for filling a plurality of said containers at said plurality of load cells, said mobile filling units being alternately transportable to said filling position and being removable from said filling position and to a cleaning area, said first one of said filling units being in said filling position and having a removable connection to said source of liquid product for dispensing the liquid product into the containers and also *having a removable connection to said sensing means* to determine the filling of the liquid product into the containers, said second one of said filling units being in said cleaning area and being readied for operation and for transport to said filling position for the next filling of such containers.

Ideal asserts that Neupak's sale of two swing-arm fillers to the Fuller O'Brien Company in 1992 invalidates claims 7–9, 12, 13, and 15 of the '233 patent under the on-sale bar of 35 U.S.C. § 102(b). The district court rejected Ideal's contention, finding that Ideal failed to prove that every element of the '233 patent is shown in the 1992 swing-arm fillers. In particular, the court found that the 1992 swing-arm fillers do not satisfy the claim limitation requiring "mobile filling units transportable relative to [the] filling position." We agree with Ideal that the swing-arm fillers may be "mobile" in the sense that they are capable of being moved readily between different positions along the arc defined by the swing arm. We cannot agree, however, that the swing-arm fillers are sufficiently mobile so as to be "transportable," because they are incapable of being carried over a long distance from one place to another. Rather, they are permanently affixed to the conveyor belt by the swing arm, and their range of motion is limited to positions along the arc defined by the swing arm. We therefore agree with the district court that in light of the different nature of their mobility, the swing arm fillers do not anticipate the claims.

In addition to finding that the 1992 swing-arm fillers do not satisfy the "mobile filling unit transportable" limitation, the district court also found that the swing-arm fillers do not constitute invalidating prior art because they do not satisfy the limitation requiring that the apparatus have a "removable connection" (or that it be "removably connected") to the sensing means. The district court construed the term "removable" to mean "easily removable," and Ideal does not take issue with that construction. In the 1992 swing-arm fillers, the record shows that the load cells (the "sensing means") are an integral part of the filling mechanism on the conveyor. The swing-arm fillers remain permanently affixed to the filling mechanism and load cells at all times via the pivot arms. The swing-arm fillers therefore cannot be considered "removably connected" to the sensing means for purposes of claim 15, because of the permanent structural connection between the swing-arm fillers and the load cells at the filling position.

Ideal asserts that the "removable connection" limitation of claims 7–9, 12, and 13 is satisfied in the 1992 swing-arm fillers by the "quick-disconnect" fittings located on the individual dispensing heads, which can be used to disconnect the dispensing heads from the pneumatic air lines that control the operation of the dispensing valves in accordance with signals received from the load cells. Although the pneumatic control connections can be broken at the location of the quick-disconnect fittings, the district court did not clearly err in concluding that the pneumatic air lines, which connect the filling units and the load cells, are not easily removable and thus do not qualify as "removably connected." The record shows that the pneumatic control lines are bundled in a conduit that remains permanently bolted to both the swing arm and the frame of the filling machine. In addition, an electrical switch with wires leading to the control panel remains bolted to the swing arm, and Ideal's expert admitted that the swing-arm fillers would have to be taken out of service to be disconnected from the sensing means. In sum, we see no clear error in the district court's conclusion that the 1992 swing-arm fillers do not satisfy the "mobile filling unit transportable" limitation or the "removably connected" or "removable connection" limitations. We therefore uphold the district court's conclusion that the swing-arm fillers do not anticipate the '233 patent.

B

Ideal next contends that even if the 1992 swing-arm fillers do not constitute anticipating prior art, they render the claimed inventions obvious either on their own or in combination with other prior art. We disagree.

In addition to not being "transportable" and not being either "removably connected" or having a "removable connection" to the sensing means, the 1992 swing-arm fillers do not satisfy several other limitations of the various claims of the '233 patent. For example, Ideal itself identifies the "wheels" limitation of claims 5, 6, 14, and 15, as well as the "at all times unconnected" limitation of claims 10, 11, and 14, as not being met by the swing-arm fillers. Furthermore, the swing-arm fillers would not appear to satisfy the limitation of claim 7 requiring that the machine be transportable to a "remote cleaning area."

In an effort to bridge the gaps between the 1992 swing-arm fillers and the '233 patent, Ideal argues that the requisite suggestion to modify the swing-arm fillers to obtain the inventions of the '233 patent can be found in the swing-arm fillers themselves, the general problem they were designed to solve, and the knowledge of those of ordinary skill in the art. In particular, Ideal relies on testimony by its own employees that a person of ordinary skill in the art, upon viewing the 1992 swing-arm fillers, would have recognized that they could be made more versatile by removing them from the pivot arms and adding extra wheels to create freestanding filling units that could be moved to a wider variety of locations. The district court rejected much of the testimony regarding obviousness presented by Ideal because it "relied on hindsight to conclude that the '233 patent was obvious." Although the modifications necessary to bridge the gap between the swing-arm fillers and the claimed inventions appear to be modest, we cannot conclude that the district court clearly erred in finding that Ideal's evidence did not constitute clear and convincing proof that the claimed inventions would have been obvious in light of the 1992 swing-arm fillers.

In addition to the 1992 swing-arm fillers, Ideal points to seven other prior art references and contends that the inventions of

the '233 patent claims would have been obvious in light of those references, in combination with the swing-arm fillers. In order to establish that the claims would have been obvious, Ideal must show some teaching, suggestion, or motivation to combine the prior art references in a manner that would result in the inventions of the '233 patent. *Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1348, 53 USPQ2d 1580, 1586 (Fed.Cir.2000). Ideal directs us to isolated statements in the prior art purportedly suggesting the benefit of one or another claim element. Considered individually or as a whole, however, the prior art references cited by Ideal do not lead us to conclude that the district court clearly erred in finding an absence of the necessary motivation or suggestion to combine the features of the prior art to obtain the patented inventions.

■ Ideal next contends that the district court, in reaching its determination of nonobviousness, improperly credited the inventors' testimony about how they invented the subject matter of the '233 patent. Although Ideal correctly notes that obviousness is determined from the perspective of a hypothetical person of ordinary skill in the art, the district court did not err by considering the inventors' testimony in the course of reaching its decision. The inventors' testimony was relevant to whether the inventions would have been obvious to a person of ordinary skill in the art, and there is no indication that the trial court misunderstood the proper legal standard or gave the inventors' testimony undue weight.

■ Ideal also challenges the district court's finding that the '233 patent enjoyed commercial success, a factual determination that this court reviews for clear error. *Winner,* 202 F.3d at 1348, 53 USPQ2d at 1586. At trial, Neupak and ideal both submitted expert reports addressing the

question whether Neupak's mobile filling cart, the commercial embodiment of the '233 patent, enjoyed commercial success. The district court found that Ideal's evidence was "confusing" and that it "did not ... accurately portray the relevant markets." On the other hand, the court credited Neupak's evidence that its mobile filling cart "quickly became Neupak's biggest seller, and now constitutes a large percentage of Neupak's business."

When a patentee demonstrates commercial success, usually shown by significant sales in a relevant market, and shows that the successful product is an embodiment of the inventions disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention. *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,* 106 F.3d 1563, 1571, 41 USPQ2d 1641, 1647 (Fed.Cir.1997). Although sales figures coupled with market data certainly provide stronger evidence of commercial success, sales figures alone can provide satisfactory evidence of commercial success. *Tec Air, Inc. v. Denso Mfg. Mich., Inc.,* 192 F.3d 1353, 1361, 52 USPQ2d 1294, 1299 (Fed.Cir.1999). Because the record shows that between 1995 and 2000 Neupak's patented mobile filling carts enjoyed a significant increase in sales and constituted an increasing share of Neupak's business, the district court did not clearly err in concluding that Neupak demonstrated a nexus between commercial success and the '233 patent. The burden thus shifted to Ideal to prove that the commercial success was instead due to factors extraneous to the patented invention, such as advertising or superior workmanship. *J.t. Eaton,* 106 F.3d at 1571, 41 USPQ2d at 1647.

In an effort to rebut Neupak's showing of commercial success, Ideal makes two arguments. First, Ideal argues that the features allegedly responsible for the com-

mercial success of the patented device were already present in the 1992 swing-arm fillers, and that the sales of Neupak's mobile filling carts merely replaced sales of the swing-arm fillers. Second, Ideal argues that the commercial success of Neupak's patented mobile filling carts is attributable to an increase in Neupak's sales staff.

Ideal's efforts to explain away the commercial success of Neupak's mobile filling carts do not persuade us that the district court clearly erred in finding commercial success. As discussed above, the swing arm fillers lacked at least two of the most beneficial features of the '233 patent, namely the aspects of being "transportable" and being "removably connected" or having a "removable connection" to the sensing means. Those differences are significant because the record shows that the swing-arm fillers were commercially unworkable because of contamination problems resulting from cleaning the filling heads close to conveyer and because of floor congestion caused by the various product piping and cleaning solution hoses. Furthermore, we consider Ideal's argument regarding the increase in Neupak's sales staff to be little more than speculation.

In sum, we are not prepared to overturn the district court's ruling that Ideal failed to satisfy its heavy burden of proving, by clear and convincing evidence, that the inventions of the reexamined '233 patent would have been obvious to one of ordinary skill in the art at the time they were invented. We therefore affirm the district court's determination of nonobviousness.

## C

■ Terence Roberts, the President of Neupak, is one of the co-inventors of the '233 patent. Ideal asserts that the '233 patent is unenforceable for inequitable conduct based on Mr. Roberts's failure to disclose the 1992 swing-arm fillers and other prior art references to the PTO. The district court rejected Ideal's inequitable conduct argument, finding (1) that 1992 swing-arm fillers were not material prior art and (2) that there was a lack of evidence of intent to deceive the PTO.

Before the district court, Ideal argued that inequitable conduct occurred during both the original prosecution and the subsequent reexamination. Although the district court's analysis of inequitable conduct focused primarily on the reexamination, the parties agree that the issue of inequitable conduct during the original prosecution is subsumed within the district court's overall analysis of inequitable conduct.

In addressing Ideal's anticipation and obviousness arguments, we have already discussed the differences between the '233 patent claims and the 1992 swing-arm fillers. Based on those differences, we conclude that the district court did not clearly err in determining that the 1992 swing-arm fillers were not material prior art for purposes of the inequitable conduct analysis. We therefore do not reach Neupak's argument that the 1992 swing-arm fillers were immaterial as a matter of law for purposes of the reexamination, on the ground that the prior art pertinent to a reexamination is limited by statute to patents and printed publications. *See generally* 35 U.S.C. §§ 301–305.

The district court's finding on intent depended heavily on its assessment of Mr. Roberts's credibility. The district court also reviewed a series of memorandums exchanged between Mr. Roberts and his patent attorney during the process of drafting an inventor's declaration for use in the reexamination proceedings. The court found that those memorandums did not evince any intention to mislead the

PTO, but instead showed "the typical back-and-forth that must take place between lawyer and client when preparing a factually complicated and legally sophisticated affidavit." We find no clear error in that conclusion. Ideal also directs us to other evidence on the record, including the advertisement of the 1992 swing-arm fillers as "patent pending" at a October 1992 trade show, and various arguments made by Mr. Roberts's patent attorney during the initial prosecution and subsequent reexamination. Having reviewed the record as a whole, we conclude that the district court's finding of an absence of deceptive intent is not clearly erroneous. In light of the court's findings on the issues of materiality and intent, we hold that the court did not abuse its discretion by rejecting Ideal's inequitable conduct theory. Because we uphold the district court's rulings on the issues of invalidity and unenforceability, we of course reject Ideal's arguments that the district court should have held the case to be exceptional and awarded it attorney fees.

### III

■ Neupak cross-appeals from the district court's decision that claim 7 was substantively changed during reexamination. On appeal, Neupak urges this court to find that the amendments to claim 7 were merely clarifying rather than substantive in nature, and to direct the district court to reinstate the claims of infringement. Contrary to Ideal's submission, we conclude that Neupak has not waived this issue, and we therefore address the cross-appeal on the merits.

The purpose of reexamination is to permit a patentee or other interested person to obtain review and, if necessary, correction of the claims that resulted from the initial examination of the patent. *Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247, 1249, 44 USPQ2d 1859, 1861 (Fed. Cir.1997). The effect of a reexamined patent during the period before issuance of the reexamination certificate is governed by 35 U.S.C. §§ 252 and 307(b). Under those provisions, if the patentee makes substantive changes in the claims during reexamination, there is an irrebuttable presumption that the original claims were materially flawed. *Bloom*, 129 F.3d at 1249, 44 USPQ2d at 1861. In that setting, the statute relieves those who may have infringed the original claims from liability during the period before the claims are validated. *Id.*

If substantive changes were made to original claim 7 during reexamination, Ideal is not liable for infringement for the period preceding the issuance of the reexamination certificate on May 11, 1999. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346, 49 USPQ2d 1199, 1202 (Fed. Cir.1998). In determining whether substantive changes were made, we look to whether the scope of amended claim 7 is identical to that of original claim 7, regardless of whether different words are used. *See id.* We review without deference the district court's conclusion that the scope of claim 7 was substantively changed during reexamination. *See id.* at 1346–47, 49 USPQ2d at 1202.

The language of original claim 7 required a first mobile filling unit having "a connection" to the source of liquid product and flow means and "a connection" to the sensing means. As amended during reexamination, claim 7 requires a first mobile filling unit having "a *removable* connection" to the source of liquid product and "a *removable* connection" to the sensing means. Although original claim 7 purportedly encompassed devices having either permanent or removable connections, amended claim 7 covers only those devices having removable connections. A compar-

ison of the text of the original and reexamined claims thus suggests that the amendments narrowed the scope of claim 7.

Neupak argues that the reexamination amendments adding the word "removable" did not make a substantive change in the claim's scope, but merely clarified the claim. According to Neupak, statements elsewhere in the claim language and in the specification limited original claim 7 to removable connections, and the amendments only clarified claim 7, rather than narrowing its scope.

Although Neupak asserts that the first and second filling units recited in original claim 7 are identical and interchangeable, there are stark differences in the claim language used to describe each filling unit. The first filling unit is claimed in original claim 7 as "being in said filling position and having a connection to said source of liquid product and said flow means for dispensing the liquid product into the containers and also having a connection to said sensing means to determine the filling of the liquid product into the containers." In contrast, the second filling unit is claimed as

> being in said cleaning area and remote from said filling position and being readied for operation and for transport to said filling position wherein the second one of the filling units will be subsequently connected to the source of liquid products and to said sensing means for the next filling of such containers.

Although the written description could support claims to first and second mobile filling units that are identical and interchangeable, that is not how they were claimed. We therefore see no need to import such extraneous limitations into original claim 7.

Neupak also argues that the claim language requiring the "second" mobile filling unit to be "subsequently connected" to both the product source and sensing means necessarily requires that the first filling unit be removably connected. We disagree. Although the "subsequently connected" language clearly relates to the connection of the second filling unit, there is no language in original claim 7 suggesting that it refers to connection subsequent to the connection of the first filling unit. Rather, "subsequently connected" refers to action that takes place following the second filling unit's "being in said cleaning position and remote from said filling position and being readied for operation and for transport to said filling position." The plain language of original claim 7 thus contemplates that a first filling unit may be either permanently or removably connected to the product source and sensing means, and that a second filling unit—subsequent to being readied for operation and transport—may be connected in tandem with the first.

Neupak next directs us to the following text found in the specification:

> It should also be obvious that mobility of the unit allows for transport of a cleaned unit to the filling location, simple connection to a proper material source and to the various sensing devices which determine the desired filling points, volumetric or weight, performance of the filling operation and thereafter total transport to a cleaning area with another clean unit being moved in for the next material filling of containers.

'233 patent, col. 6, ll. 33–40. Neupak argues that the reference in the specification to the act of "simple connection" limits original claim 7 to require that both mobile filling units have removable connections to the product source and sensing means. We disagree.

Although the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader

than such embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054, 32 USPQ2d 1017, 1021 (Fed.Cir.1994). Here, the specification of the '233 patent expressly states that the described embodiment is preferred, and there is nothing that would lead a reader to infer that the broad language of original claim 7 is limited to the preferred embodiment.

Neupak fails to address the prosecution history of the '233 reexamination, which the district court analyzed in thorough detail in reaching its conclusion that the amendments to claim 7 were substantive in nature. In the November 3, 1998, advisory action, the examiner rejected the patentee's argument that "because the specification discloses a removable connection, all limitations in the claim are construed to be removable." Instead, the examiner noted that "the current claims clearly call for removable connections, as in claims 12–20, and connections which are worded broadly enough to include static connections, such as in claims 1–11. One of ordinary skill in the art would consider the claimed generic connections to include static connections." Because the prosecution history illustrates that the addition of the word "removable" in amended claim 7 was necessary to distinguish that claim over the prior art, the district court correctly viewed the amendment as a substantive change in claim scope. Accordingly, we affirm the district court's order barring Neupak from recovering damages for acts of alleged infringement predating the issuance of the reexamination certificate, and the court's consequent dismissal of Neupak's infringement claims.

Each party shall bear its own costs for this appeal.