# United States Court of Appeals for the Federal Circuit

2009-1022

MEDIA TECHNOLOGIES LICENSING, LLC,

Plaintiff/Counterclaim Defendant-
Appellant,

v.

THE UPPER DECK COMPANY, THE UPPER DECK COMPANY, LLC,
UPPER DECK DISTRIBUTION & SALES COMPANY,
and UPPER DECK DISTRIBUTION & SALES COMPANY, LLC,

Defendants/Cross Claimants-Appellees,

and

PLAYOFF CORPORATION,

Defendant/Counterclaimant-Appellee,

v.

ADRIAN GLUCK,

Cross Defendant-Appellant.

Gregory S. Dovel, Dovel & Luner, LLP, of Santa Monica, California, argued for plaintiff/counterclaim defendant-appellant and cross defendant-appellant.

Matthew Borden, Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP, of Los Angeles, California, argued for defendants/cross claimants-appellees. With him on the brief were Joseph R. Taylor and James E. Doroshow.

Eric D. Kirsch, Cooper & Dunham LLP, of New York, New York, argued for defendant/counterclaimant-appellee. With him on the brief were Norman H. Zivin and Tonia A. Sayour.

Appealed from: United States District Court for the Central District of California

Senior Judge Alicemarie H. Stotler

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2009-1022

MEDIA TECHNOLOGIES LICENSING, LLC.

Plaintiff/Counterclaim Defendant-Appellant,

v.

THE UPPER DECK COMPANY, THE UPPER DECK COMPANY, LLC.
UPPER DECK DISTRIBUTION & SALES COMPANY,
and UPPER DECK DISTRIBUTION & SALES COMPANY, LLC,

Defendants/Cross Claimants-Appellees,

and

PLAYOFF CORPORATION,

Defendant/Counterclaimant-Appellee,

v.

ADRIAN GLUCK,

Cross Defendant-Appellant.

Appeal from the United States District Court for the Central District of California in case no. 01-CV-1198, Senior Judge Alicemarie H. Stotler.

_____

DECIDED:  March 1, 2010
_____

Before MAYER, LOURIE, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge MAYER.  Dissenting opinion filed by Circuit Judge RADER.

MAYER, Circuit Judge.

Media Technologies Licensing, LLC ("Media Tech") appeals the judgment of the United States District Court for the Central District of California granting summary judgment that U.S. Patent No. 5,803,501 ("'501 patent") and U.S. Patent No. 6,142,532 ("'532 patent") are invalid due to obviousness. Media Techs. Licensing LLC v. Upper Deck Co., No. 01-1198 AHS-AN (C.D. Cal. Oct. 6, 2008). We affirm.

*BACKGROUND*

On December 15, 1994, Adrian Gluck filed U.S. Patent Application No. 356,481 for a "Memorabilia Card." This application matured as the '501 patent. Gluck filed a continuation of the '481 application that matured as the '532 patent. Both the '501 and '532 patents are drawn to an invention that "provide[s] an actual piece or portion of an item in combination with a photograph or the like of a famous figure having a relationship to the item." '501 patent col.1 ll.58-61; '532 patent col.1 ll.59-62.

Asserted claims 1, 6, and 7 of the '501 patent are independent claims that generally cover a piece of a memorabilia item attached to a trading card near where the actual item would typically appear in an image that depicts the item's relationship to the person shown on the card. Claim 1, for example, recites:

> A memorabilia card comprising a substrate in the form of a card and having an image surface,
>
> the image surface including a background image and a foreground image, and wherein the foregoing image is of a famous figure,
>
> a piece of a memorabilia item being adhered to the card adjacent to where an image of the actual item normally would appear, and
>
> the card including a certificate attesting to the authenticity of the item.

The '532 patent's asserted claims (reexamined claims 23-29) generally require attaching a tiny piece of a particular sports memorabilia item, sports clothing, or entertainment clothing. Claim 23, for example, recites:

> An article of memorabilia comprising:
>
> a first member, and
>
> a portion, but not the entirety, of an authentic memorabilia item used by a popular sport or entertainment personality or during a memorable event, said portion attached to said first member wherein the authentic item is a baseball bat, and said portion comprises a tiny piece of wood taken from that bat.

On November 19, 2001, Media Tech sued Upper Deck Co. for infringement. The district court granted summary judgment in favor of defendants on the basis of res judicata, which this court reversed. Media Techs. Licensing, LLC v. Upper Deck Co., 334 F.3d 1366, 1371 (Fed. Cir. 2003). Defendants then filed requests for reexamination of both the '501 and '532 patents. The district court stayed the case pending the reexaminations. A reexamination certificate issued for the '501 patent confirming the claims in their original form. A reexamination certificate issued for the '532 patent that added new claims 16-29.

On October 6, 2008, the district court issued a claim construction order, granted Media Tech's motion for summary judgment on the defense of anticipation, and granted defendants' motion for summary judgment that the patents were obvious. Media Tech timely appeals; defendants do not cross-appeal their adverse rulings. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A district court's grant of summary judgment is reviewed without deference, reapplying the same standard as the district court. Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1121 (Fed. Cir. 2003). "In deciding whether summary judgment was appropriate, we view the evidence in a light most favorable to the party opposing the motion with doubts resolved in favor of the opponent . . . ." Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 149 F.3d 1309, 1315 (Fed. Cir. 1998). Whether an invention would have been obvious at the time the invention was made is a question of law, which we review de novo, based on underlying factual determinations, which we review for clear error, Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1355 (Fed. Cir. 2007), unless, as is the case here, no material facts are in dispute.

A patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). An obviousness analysis is based on several factual inquiries. A court must examine the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406-07 (2007) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)). At that point, a court may consider secondary objective evidence of nonobviousness, such as commercial success, long felt but unsolved need, failure of others, and the like. Id.

The prior art here includes: (a) a trading card with a picture of Marilyn Monroe and a diamond attached to the card ("Monroe"); (b) a piece of a sheet purportedly slept on by one of the Beatles attached to a copy of a letter on Whittier Hotel stationery declaring authenticity ("Whittier"); (c) a piece of fabric purportedly belonging to a Capuchin Friar named Stephen Eckert attached to paper stock including a picture of the friar ("Eckert"); and (d) a greeting card fashioned to look like a novelty item that ostensibly includes a piece of jeans material belonging to James Dean ("Dean").

After determining the scope and content of the prior art, the differences between the prior art and the claims at issue must be determined. Media Tech argues that Monroe differs from claim 1 of the '501 patent because Monroe's diamond is neither "a memorabilia item" nor "a piece," as recited by the claim. Based on the construction of "memorabilia," "an object valued for its connection with historical events, culture or entertainment," Monroe's diamond is memorabilia. As for the "complete" vs. "piece" distinction, even if Monroe's diamond is not a "piece," Whittier, Eckert, and Dean teach using "a piece" of memorabilia.

Media Tech maintains that claim 6 of the '501 patent differs from Whittier because Whittier does not teach "a card." Monroe, however, is a card. It also asserts that Dean differs from claim 24 of the '532 patent because it does not teach using memorabilia. Dean does teach using memorabilia. It may fail to teach "authentic memorabilia," but "authentic[ity]" is taught by Whittier and Eckert. Claims 23 and 25 through 29 of the '532 patent would have been obvious for the same reasons presented for claim 24 because they differ only in their recitation of a specific type of memorabilia piece (e.g., baseball bat, baseball, etc.).

Finally, because no reference teaches a "sports trading card," the obviousness of claim 7 of the '501 patent depends on whether a person of ordinary skill would apply the teachings of Whittier, Eckert, and Dean to a "sports trading card." Accordingly, we consider the level of ordinary skill in the art. Defendants submitted testimony that a trading card designer of ordinary skill routinely used the concepts found in other card industries for trading cards. Defendants' expert was employed at Donruss Trading Card Company as a director from approximately 1991 to 1996. In his declaration, he states that the four references could well have been sought, considered, and acted on by a person of ordinary skill in the art to develop "crossover applications" for trading cards.

Media Tech asserts that a person of ordinary skill would not have combined the references—or applied them to a sports card—based on: (1) an inability to predict that a trading card would convey memorabilia authenticity; and (2) the trading card field containing an infinite number of identified and unpredictable solutions.

The "inability to predict" argument alleges that "combin[ing] . . . trading cards with a piece of a memorabilia item . . . result[ed in] . . . consumers automatically accept[ing] as authentic a piece of otherwise unidentifiable material." However, as Media Tech itself acknowledges, consumer acceptance comes from the credibility already associated with the 90-year old trading card industry. As such, Media Tech has not shown that the combination of memorabilia with a conventional trading card resulted, or would result, in consumers accepting authenticity.

Regarding the infinite number of identified and unpredictable solutions, the presentation and content characteristics of trading cards are not infinite. These characteristics are limited by the cards' physical characteristics. Moreover, while

presentation involves varying parameters (color, typefaces, layout, etc.) to produce distinctive products, the asserted claims are unrelated to presentation. Instead, they relate to content. Content solutions are significantly limited by the theme and physical confines of the card, and the finite number of available solutions were predictable. Defendants need only show that it would have been obvious to one skilled in the art to attach a sports-related item instead of those items attached in the prior art references. Defendants have met this burden, and Media Tech's assertion that a person of ordinary skill would not have combined the references—or applied them to a sports card—must fail.

Secondary objective evidence also fails to establish non-obviousness. Media Tech argues long felt but unsolved need and failure of others; initial skepticism; commercial success; unexpected results; and industry recognition.

Media Tech's "long felt but unsolved need" of "stimulat[ing] demand" suffers two deficiencies. First, the need does not correspond to the asserted claims because it is overbroad. Second, "stimulat[ing] demand" is applied too narrowly to trading card inserts. Media Tech defines success narrowly because it admits that some non-memorabilia trading-card inserts have generated interest, and are still being used. Inserts that are still in use because they generate interest are successful—and do not demonstrate failure of others. However, based on its narrow definition of success, Media Tech claims that successful inserts show failure of others because they did not "successfully stimulate[] demand in a manner similar to memorabilia cards." Media Tech cannot have it both ways with: (1) an overbroad "long felt but unsolved need" of "stimulat[ing] demand"; and (2) an exceedingly narrow definition of success that

requires a trading card insert to raise demand to levels achieved by the alleged-infringing products. We reject both Media Tech's overbroad "long felt but unsolved need," and its overly narrow definition of success.

With respect to "skepticism," Media Tech's expert states that "[n]umerous articles and commentators, including myself, originally predicted that memorabilia cards would be a short lived phenomenon and many trading card companies such as Fleer and Topps were skeptical of the concept and reluctant to introduce memorabilia cards." But this is not supported by the record. Media Tech also relies on outrage at the idea of "destroying valuable sports memorabilia." Alleged outrage over destroying sports memorabilia, however, does not demonstrate a belief that the trading-card beneficiary of that destruction would fail.

Regarding commercial success, Media Tech has established that the alleged infringing memorabilia cards sold by appellees are commercially successful; however, it has not established the required nexus between the claimed invention and commercial success. Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("if the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant"). It attempts to rely on the "presum[ption] that the commercial success is due to the patented invention." Id. To do so it must show "that the successful product is the invention disclosed and claimed in the patent." Id. (quoting J.T. Eaton & Co. v. Atl. Paste & Glue Co., 106 F.3d 1563, 1571 (Fed. Cir. 1997)). Defendants present innovative manufacturing (a 3-ply, flat card with the material piece sandwiched between layers of cardstock) and packaging as factors that are unrelated to the quality of the patented subject and essential to commercial success because they

convey authenticity and prevent consumers from detecting the memorabilia card within a package of trading cards. Media Tech offers no response to these factors, and consequently cannot benefit from the nexus presumption. See id. at 1312. In short, from all that appears, whatever success was enjoyed came from celebrity, not invention. Even if Media Tech could establish the required nexus, a highly successful product alone would not overcome the strong showing of obviousness.

In arguing unexpected results, Media Tech returns to its argument that a person of ordinary skill would not have predicted commercial success. This is an attempt to recycle its commercial success arguments by making similar arguments under the "unexpected results" heading. Commercial success, however, even if unexpected, is not part of the "unexpected results" inquiry. An unexpected result must arise from combining prior art elements; commercial success is a separate inquiry from unexpected results, and in any event has not been shown here to be a result of the invention as opposed to other factors.

*CONCLUSION*

Accordingly, the judgment of the United States District Court for the Central District of California is affirmed.

AFFIRMED

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2009-1022

MEDIA TECHNOLOGIES LICENSING, LLC.

Plaintiff/Counterclaim Defendant-Appellant,

v.

THE UPPER DECK COMPANY, THE UPPER DECK COMPANY, LLC.
UPPER DECK DISTRIBUTION & SALES COMPANY,
and UPPER DECK DISTRIBUTION & SALES COMPANY, LLC,

Defendants/Cross Claimants-Appellees,

and

PLAYOFF CORPORATION,

Defendant/Counterclaimant-Appellee,

v.

ADRIAN GLUCK,

Cross Defendant/Appellant.

Appeal from the United States District Court for the Central District of California in case no. 01-CV-1198, Senior Judge Alicemarie H. Stotler.

RADER, <u>Circuit Judge</u>, dissenting.

Relying on wholly irrelevant prior art and ignoring significant objective indicia of non-obviousness, this court substitutes its judgment on patentability for that of a jury. Lurking just beneath the surface of this court's blindness to the underlying facts supporting non-obviousness is a bias against non-technical arts. No doubt, the invention of the transistor or of the polio vaccine came from more scientific fields and contributed more to the welfare of humanity. This court, however, cannot overlook that

many individuals invest vast energies, efforts, and earnings to advance these non-technical fields of human endeavor. Those investments deserve the same protection as any other advances. The incentives for improvement and the protection of invention apply as well to the creator of a new hair-extension design as to a researcher pursuing a cure for cancer. In either case, the PTO and this court are charged with assessing the invention disclosure to determine its worthiness to receive a valuable, but temporally limited, exclusive right. Because this court dismisses this case so readily, I respectfully dissent.

As mentioned, this invention does not advance rocket science or cancer medicine. Still, for many individuals, this avocation wins vast devotion. The trading card industry was born in the late 19th century when tobacco companies began inserting images of baseball players into cigarette packs. Soon thereafter the trading card concept spread to other industries, most notably gum companies. Over the next century, the cards became standardized and sold in stand-alone packs without any tandem product, such as gum or peanuts. By the early 1990s, with competition intensifying, trading card companies introduced limited edition insert cards — e.g., autographed cards or holographic cards — to spark sales with the hope of acquiring a scarce and valuable asset.

The '501 patent was filed in 1994. Up until that point, not a single reference in over a century of history disclosed attaching a cut-up piece of a memorabilia item to a baseball card. The concept behind the invention was initially met with much skepticism. The major trading card companies, including the named defendants in this case, rejected Adrian Gluck, the inventor of the '501 patent. They reasoned, quite logically at

the time, that the value of a particular memorabilia item depended on its physical preservation. Indeed, all the prior art suggested that the value of an item of memorabilia hinged on its condition. In better condition, the item brought maximum value; in worse condition, far less. Thus, the notion of cutting up an authentic player's jersey into numerous pieces and attaching it to a trading card seemed sure to destroy far more value than it could ever create. According to the standard wisdom in this field, the dismembered jersey could not enhance the value of either the jersey or the card.

A year after Gluck approached Upper Deck with his idea, however, the company undertook an experiment and began selling limited edition cards with accompanying cut-up jersey pieces affixed adjacent to the player's image. The new card product quickly became a hit with collectors and received praise throughout the formerly skeptical industry. One popular trade article opened with the following:

> Can you imagine anyone cutting a game-used Dan Marino jersey into little pieces? Proud owners of such memorabilia probably wouldn't even keep a pair of scissors in the same room as No. 13. But Upper Deck does.
>
> For the Southern California company, combining sharp instruments with authenticated jerseys has been as successful as the combination of sports cards and memorabilia. Last month's issue of Sports Cards Magazine had Upper Deck's Game Jerseys and A Piece of the Action cards in the top two on the demand list for insert singles for baseball, hockey, football and racing. . . . Based on Upper Deck's early success, it's apparent that Game Jerseys are exactly what collectors wanted.

Another trade magazine clamored:

> There was a time when spreading peanut butter and jelly between two slices of bread may have been an unthinkable combination. Today, millions of school children, and just as many grown-ups, rely upon the celebrated sandwich as a lunch-time staple.
>
> So it goes with most ground-breaking ideas; an open mind plays an important role in developing a vision. Those who look beyond the ordinary

can often see the future. Those who don't simply mutter, "Why didn't I think of that?"

The creative minds at Upper Deck search for that elusive gem every day, striving to provide collectors with the hobby's version of the next PB&J. As for the company's Game Jersey idea—a unique card set randomly inserted into all Series I packs of 1997 Upper Deck baseball—it's not exactly edible. But, gauging from collector interest, it is desirable.

These excerpts are only a small sample from the record of the accolades for the Gluck invention. With various marketing campaigns and advertisement promotions touting the idea behind the '501 patent as their focal point, the newly-released cards became a staple of the industry. Using the invention, Upper Deck swept to the forefront of this new wave.

Without even so much as a cursory review of these unexpected results, the skepticism of experts, the commercial success, the flattery of copying, or any other objective facts, this court concludes in a rather passing fashion that the claimed invention would have been obvious at the time of invention based on the prior art references. But viewed in the context of the record as a whole, the prior art does not support that judgment as a matter of law.

Most important, none of the prior art references are remotely related to the sport trading card industry. The defendants' failure to proffer any reference in the relevant field of invention is telling given the century-old history of this industry. Perhaps claim 1 can fairly be interpreted to include memorabilia items beyond the sporting world, but other asserted claims are expressly limited to sports trading cards. Thus, this court ought to seek at least some prior art in the primary field of its application and use. And the absence of any prior art in that area ought to speak volumes.

Setting aside the sports versus non-sports issue, each of the prior art references in this case is still distinctly different from the claimed invention. The Monroe reference discloses a diamond attached to a photo of Marilyn Monroe on a card. Unlike an authentic jersey worn by an athlete during a game or a match, the diamond itself has no inherent value derived from its "connection with historical, events, culture, or entertainment" as required by the district court's construction for "memorabilia item." Rather, the diamond itself attains cultural significance only when attached to a picture of Marilyn Monroe. In addition, the '501 patent teaches cutting a "memorabilia item" into "pieces." The Monroe diamond is not a "piece" of any "memorabilia item" within the context of the '501 patent.

The Whittier reference discloses a cut-up piece of a bed sheet once graced by one of the Beatles. The Whittier prior art reference attaches the scrap of cloth to a stationery paper with a statement of authenticity. It bears the date 1964. Besides the defendant's admission that the bed sheet in one of its proffered exhibits is a fake, the reference also does not disclose any "trading card" or "photo" as those terms are used in the '501 patent. This reference has many differences besides its distant removal in time.

The Eckert reference is a "holy card" used to familiarize the public with a particular religious figure to promote that candidate for sainthood. A picture of a friar named Stephen Eckert appears on paper stock next to fabric represented as a piece of his clothing. As with the Monroe reference, it is a far stretch at best to say that Eckert discloses a "memorabilia item" as contemplated by the district court's construction. Nor were "holy cards" purchased, traded, or valued like typical trading cards or "memorabilia

items." Their sole purpose was to increase the fame of the particular religious figure featured.

Finally, the James Dean reference features a picture of James Dean on a greeting card next to an undisputedly fake piece of the celebrity's jeans. It is entitled, "Rebel's Cause Lives: Ecstatic discovery! James Dean's Jeans!" Despite defendants' general admission that the prior art reference itself was intended as a joke, they still maintain that the reference would have motivated a skilled artisan to cut up a memorabilia item for a sports card. Quite the opposite, a reasonable inference could be made — which this court must credit on summary judgment — that the James Dean reference teaches away from the claimed invention for the very fact that it was a joke, a fake (not a "memorabilia item"), and, in many other ways, different from the claimed invention. In sum, the prior art references of record are each inherently different and lack much of the uniqueness and novelty of the claimed invention.

Finally, the record is dubious at best — particularly at this summary judgment stage — in suggesting that a person with skill in this art would even consider the four prior art references relied on by defendants, much less combine them. In that vein, this court cites primarily to defendants' expert Scott Kelley to make the vast leap from these sketchy and different references taken in isolation. Mr. Kelly's declaration, to my eyes, resounds with conclusory statements that lack any convincing reference to the actual record. To rely on such "expertise" without considering the countervailing factual evidence on record contravenes the role of a court at the summary judgment stage and gives accused infringers a free pass to avoid a jury's judgment on the facts — in a sense, a get-out-of-jail-free card (no pun intended).

Plaintiff also proffered an expert, Henry Taylor, with credentials similar to those of Mr. Kelly but with opposite conclusions on obviousness. Why, on summary judgment, would this court give Mr. Kelly's opinions more weight than those of Mr. Taylor? Is this an indication that this court views this field of art and this invention as unworthy of the full processes of the law?

In addition, this court's analysis about the finite number of solutions in the art is unconvincing. Under this rationale, no party could receive a patent in the trading card industry because the solutions are "limited by the cards' physical characteristics," "theme," and "physical confines." In fact, as noted above, the trading card industry heralded this invention. Thus, the industry that best evaluates advances in its own field seems to question this court's summary conclusion.